(No. 15561.—Judgment reversed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. JOHN G. MASSIE, Plaintiff in Error.

*Opinion filed February 19, 1924.*

1. CRIMINAL LAW—*what constitutes the confidence game.* The confidence game is any swindling operation by which the swindler obtains the money of another person by taking advantage of his confidence for the purpose of betraying it and swindling him.

2. SAME—*intention to swindle must be proved beyond reasonable doubt to establish confidence game.* Before a defendant can be found guilty of the charge of the confidence game the intention to swindle the prosecuting witness must be proved beyond a reasonable doubt, and it must also be proved beyond a reasonable doubt that the defendant actually obtained or procured money or property by some effort on his part.

3. SAME—*what does not make defendant responsible for false representations of agent—confidence game.* Where a defendant is charged with the confidence game in the promotion of oil stock, the facts that he was made president of the oil company and that the company used his office (the defendant being a practicing physician) as headquarters of its agent employed to sell the company's stock do not make the defendant responsible for false representations made by the agent in selling stock, in the absence of any showing that the representations were authorized by the defendant.

4. SAME—*what evidence of other transactions is not competent to prove confidence game.* Where the president of an oil company is charged with the confidence game in selling oil stock by false representations, evidence of transactions similar to those charged in the indictment are competent to be received provided they were transactions in which the defendant was involved, and evidence of false representations made by agents in such similar transactions is not competent unless the representations are shown to have been authorized by the defendant.

5. SAME—*when defendant should be permitted to testify to his knowledge of books of corporation.* Where the president of an oil company is charged with the confidence game and it is shown that all the records of the corporation have disappeared and cannot be found, the defendant should be permitted to testify that he had seen an unrecorded assignment of a lease to the company, and that according to his information, derived from the books of the company, dividends were paid out of the profits and not out of the capital stock of the company.

WRIT OF ERROR to the Circuit Court of St. Clair county; the Hon. GEORGE A. CROW, Judge, presiding.

P. C. OTWELL, and P. K. JOHNSON, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, HILMAR C. LINDAUER, State's Attorney, and EDWARD C. FITCH, (JAMES A. FARMER, and LOUIS KLINGEL, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

John G. Massie was indicted, jointly with Cyrus N. Noble, Herbert Todd and Harry Springgate, for obtaining $140 of Anna Voellinger by the confidence game, was tried separately, convicted and sentenced to the penitentiary, and has sued out a writ of error, contending that the evidence does not justify the conviction and that the court erred in the admission and rejection of evidence and in instructing the jury.

The plaintiff in error at the time of the occurrences resulting in his indictment was a physician, forty-two years old, practicing his profession in Belleville, where he had resided for many years. In December, 1918, his sister wrote to him that early in that month she had married Herbert C. Todd, who was unknown to Massie. In the last week of December or first few days of January Massie sent $1000 to Todd to invest in oil leases. On March 1, 1919, Todd came to Belleville, where Massie first met him at Massie's home and gave Todd $1000 more. In April, 1919, the Ilgahoma Oil Company was organized at Nowata, Oklahoma, having a capital stock of $75,000, divided into $100 shares, with Todd, Massie and P. D. Todd directors and Massie was elected president. Massie had given Todd $4200 in all, at the time, to invest in oil leases. These leases were assigned to the new company, which immediately began to develop them by drilling wells. The production of oil began

in June, 1919, and after August constantly increased until January, 1920, for which month it amounted to $4130.95. The wells were in what was known as the Shipley pool,— a field of about 3000 acres five miles west of Nowata. It contained the Wolfe lease and three Zelgar leases, which were operated by the Ilgahoma Oil Company. Massie made his first visit to Nowata and the oil wells on October 4, 1919, when he first met P. D. Todd, Herbert C. Todd's father, as well as John F. Shipley, who opened up the field, and others. He saw the three wells on the Zelgar leases, with the necessary equipment, power houses, pipe lines, jacks and other supplies. There were four 100-barrel tanks, into which oil was being pumped from the wells. The company also owned the Zane 80-acre lease. His next visit was on October 28, when Clem Fisher and Albert Sainteve, two stockholders from Belleville, went with him, and they saw the oil being pumped from these wells and others which had been brought in later. He made another visit on November 18 with other Belleville stockholders, and after each of these last mentioned visits the stockholders who accompanied him, or some of them, bought more stock and induced their friends to buy. In October the capital stock of the company was increased to $250,000. Massie received a telegram from Herbert C. Todd containing an offer of $750,000 for the leases of the company in the Shipley pool, but it was refused because the excess profits tax would take too large a part of the purchase money. On October 18 a dividend of one per cent was declared, payable on November 15, and on November 18 a dividend of one per cent was declared, payable on the twenty-fifth days of November, December and January to the stockholders of record on the fifteenth day of those months, respectively. Massie received checks for these dividends as well as for $125 a month for his salary as president, but indorsed the checks and returned them to Todd to be put back in the company. Other leases were purchased in Kansas and Texas, more

311—21

wells were being put in, and in order to handle the leases acquired in Kansas and Texas, as well as their other fields in Oklahoma, it was resolved at a meeting of the stockholders to increase the capital stock from $250,000 to $1,500,000. In accordance with this plan, on January 28, 1920, the Ilgahoma Petroleum and Gasoline Company was organized with a capital stock of $1,500,000, divided into $10 shares, which later took over all the property of the Ilgahoma Oil Company and issued to the stockholders of the latter company stock in the new company at the rate of three times the par value of the stock of the old company. The remaining $750,000 of stock in the new company was to be treasury stock, to be disposed of for the purchase of more leases and the payment for development. This is the history of Massie's venture in oil from its start to February 1, 1920, as narrated by himself and supported by the other evidence in the case.

On February 2 Massie was notified to come to Nowata, and he arrived there the next morning. Todd had called a meeting of the executive committee, and at that meeting a mortgage for $50,000, payable in ninety days, was executed to the Union Brokerage Company upon the Henderson, Zelgar, Zane, Tate and Cochran leases, together with all the title and interest in the property and all the personal property thereon belonging to the Ilgahoma Oil Company, and an assignment of the oil produced from those leases, as collateral security for the payment of the same indebtedness. On March 1, 1920, all the property of the Ilgahoma Oil Company was conveyed to the Ilgahoma Petroleum and Gasoline Company, and certificates of stock were issued to the stockholders of the Ilgahoma Oil Company at the rate of three dollars for one dollar of their stock in that company, which was canceled.

Massie had been the physician of Anna Voellinger's family for twenty years. He visited them and his wife did so, and they were on terms of intimacy. About February

1, 1920, Anna Voellinger's brother was sick and she was with him. Massie was attending him and talked to Anna about his good investment. She testified that he said to her, "You are five sisters and each one ought to invest $300" with his thousands. He said, "We are just growing richer and richer but people don't know it; whenever you buy stock, if you don't want them we will buy them back." She served him a lunch, and as they sat at the table he said, "It is a good investment; if you have any money this is the time you can make a good investment; we pay eight per cent, if you have any money to invest." She testified that she saw Massie again on February 19 and he talked to her then about it. He pulled a dollar out of his pocket and said to her sister as he laid it in her hand, "If you give us $100 you are going to get $300 in a short time; you will get $300 for $100 in a short time." Anna went with her sister and she put in her $300. Anna said, "I would take stock but I have no money on hand." She told Massie she first had to earn money. On April 9 Springgate called her on the telephone and said he was a salesman under Massie for the oil stock and would like to see her, and within half an hour or so he was at the house. He told her he was the salesman and Massie had sent him; that he said she would like to buy some stock. She said, "Yes, because I have great confidence in the doctor; I have known him for many years." She bought fourteen shares, for which she paid Springgate $140, cash. The certificate did not come for about four weeks, and she called up Massie's office and got her certificate on May 10. She never got any dividend. She testified that a day or two after that Massie called her on the telephone and said he would like to see her; that he and Springgate both came to her place and Massie said he would like to sell her more stock, because "this is the place where you can invest your money and grow fat; this is the time." He further said that she had better buy more stock, because there were lots more oil

wells; that he just came back from the fields, and he asked her to give him a check for $1000. Her sister had just got a check by mail on May 8 for a dividend in a letter signed by Todd, who also signed the check. Massie asked her if she heard her sister got her dividend, and she answered that she knew it; that she went to the bank and collected it.

On May 10 Massie went to Nowata and met Todd there, who told him that the mortgage given in February was being foreclosed; that the production of the wells had dropped down to about 18 or 20 barrels a day; that the Union Brokerage Company demanded its money, and the only thing to do was to dispose of that batch of holdings for the price of $80,000. He said there were $30,000 in claims for supplies, labor and materials due against the company. Massie asked him why he had been keeping him informed all the time that the production had been from 120 to 140 barrels a day, and Todd said, "It is not that now." He said that Hub Reed had offered $80,000 for the Newgin, Wolfe and three Zelgar leases in the Shipley pool; that suits had been threatened against the company, and there was nothing to do but to accept the offer of $80,000 in order to save the other holdings. Massie· acted on this information and joined the others in executing a conveyance of the property for $80,000, which was applied to the payment of the indebtedness of the Union Brokerage Company and on the other debts of the Ilgahoma Petroleum and Gasoline Company. The trustee to whom the leases had been assigned had received $12,000 or $13,000 from the production of oil during the three months, and this amount was also applied to the payment of the indebtedness of the company. Massie testified that he told Todd that he must stop Springgate and Noble, who were still making sales in Belleville. He went back to Belleville. Miss Voellinger never received any return upon her stock. Massie continued to practice medicine in Belleville until he was indicted, in October, 1920.

The plaintiff in error claims that the evidence does not show him to have engaged in any swindling operation or have been guilty of dishonest conduct but that the record discloses the following facts: Massie was the president both of the Ilgahoma Oil Company and of the Ilgahoma Petroleum and Gasoline Company, but there is no evidence that he had anything to do with the management of the property of these companies or any actual knowledge of their condition. He first invested $4000 with his newly-acquired brother-in-law, with only such information of the venture in which he was engaging, so far as appears, as his brother-in-law gave him. He accepted the presidency of the corporation in the same state of ignorance, and never saw any of its property until six months later, on October 4. He made ten visits to the scene of operations, where he met Todd and John M. Shipley, who together with Massie constituted the executive committee of the corporations, and John F. Shipley, who opened up the field and for whom it was named. On his second visit, on October 28, a dividend of one per cent was declared, and on each succeeding visit the production of oil had increased. The apparent secured success of his speculation in oil became known in the community and numerous sales of stock in the company were made. From time to time several of the stockholders visited the field of operations, saw the oil wells in which they had invested, were impressed with the opportunity of rapidly increasing their fortunes, and returned to Belleville to purchase more stock and induce their friends to invest. Meanwhile the actual managers of operations sought to increase their holdings by further purchases, and the $50,000 mortgage in February was made for the purpose of paying the remainder of the purchase price of a lease, a note in the bank for borrowed money, and other indebtedness. The increase in capital stock was for the purchase of new leases and new machinery and the expense of drilling new wells and new development. It covered substantially the produc-

ing property of the company, and when the production of
the wells, instead of keeping up, fell off, as it did, to a com-
paratively small fraction of the first production, the com-
pany was unable to meet the mortgage debt and the sale
was necessarily made for $80,000, which enabled the com-
pany to pay its debts but left it with only undeveloped
leases, incumbered for the purchase price, and with no funds
for development. No other course was possible.

.There were some suspicious circumstances. Mike Ca-
bulski testified that he bought stock of the par value of
$1000 for which he paid $1250. His certificate was dated
May 17 and Massie and Noble called on him about the 19th.
Noble said it was a mistake of the company, and the witness
said it looked like crooked work, and Massie said there was
no crooked work. F. G. Baumann testified that he attended
the meeting of the stockholders in June, over Ohms & Jung's
drug store, where Massie was asked about the mortgage
and sale and denied knowing anything about it. George
Ruebel, Jr., on the other hand, testified for the People that
he attended two meetings,—one at the First National Bank
and the other at the Commercial Club,—where Massie told
of the mortgage and sale. At a later meeting Massie was
asked a lot of questions and said that he had forgotten.
William Schaumleffel invested in stock on December 3,
1919, and went to Nowata on December 27 or 28. Mas-
sie, although not invited, went also. Todd met them at
Coffeyville, Kansas, and Todd and Massie had a private in-
terview. They then drove to Nowata, about twenty miles,
and afterward to the oil fields. The oil was coming pretty
well out of the two-and-a-half-inch pipe, but the next day
the stream of oil coming out of the pipe was about as big
as a finger. While they were there a well was shot on
other property about 150 feet from the line which proved a
dry hole, and Massie said to Schaumleffel, "Don't tell the
parties back there that it is a dry hole; you will get them
all balled up." Schaumleffel wanted to see the books, but

he was told they were kept in Tulsa, which was eighty or ninety miles away. He decided to go there, and after supper Massie informed him that he had just received a message that the book-keeper was out of town and would be out until the 15th. One of the last things that happened before the train left was that Todd said to Massie, "Now, John, for God's sake get me $20,000!" A dividend was paid as of April 25 without authorization by the company and at a time when the oil receipts were being held as security for the company's indebtedness.

The company may have been wrecked either by incompetence or dishonesty. The offense for which the plaintiff in error was indicted was obtaining the money of Anna Voellinger by means of the confidence game. A swindling operation by which the swindler obtains the money of another by taking advantage of the other's confidence for the purpose of betraying it and swindling him is a confidence game as it has been defined by our decisions. The plaintiff in error could properly be found guilty of the charge in this indictment only upon proof, beyond a reasonable doubt, of his intention to swindle Anna Voellinger out of her money by taking advantage of her confidence in him. The confidence may be assumed. Whether the intention to swindle existed was a question of fact which depended upon circumstantial evidence, and while, as has been indicated, there were some suspicious circumstances, they were not such as to justify an inference that plaintiff in error intended to swindle Miss Voellinger out of her money.

The only representations claimed to have been made by the plaintiff in error were made early in February, while the company was still operating its wells with apparent success. The sale was made by Noble in April. He was employed by the company to sell stock and was using Massie's office in Belleville as his headquarters, but he was not by these facts authorized to make false representations in regard to the stock which he was employed to sell, nor was

Massie bound by any representations made by him which Massie did not authorize. · Evidence of other transactions of a like character as those charged in the indictment was competent to be received, but it must have been evidence of transactions in which Massie was involved. Evidence of false representations made by agents in such similar transactions was not competent against Massie unless they were shown to have been made by his authority.

August Funk was permitted to testify, over the plaintiff in error's objection, that on May 21 or 22 Noble sold stock to him and said he was sent there by Massie to sell the stock; that it was a good proposition, paying two per cent a month; that it was a good investment, and he did not say anything about the company's having sold its oil wells on May 10. James Hausknecht also testified that in selling stock to him in April, Noble told him they were paying twenty-five per cent dividends. Arthur Seibert testified that Noble told him, in selling stock in May, that two per cent a month was guaranteed; that they had seventeen producing wells, producing 200 barrels a day, and were drilling nine other wells; that Massie was president and had been offered half a million dollars for his share. Noble told Joe Klotz in the first part of April that Massie had sent him; that the stock would triple itself in seven months; that they had twenty-seven wells, producing about eight barrels to the well,—about 280 barrels a day at $3 a barrel. Early in May, Noble told Henry Funk that he was Massie's right-hand man; that the stock was an awful good investment, paying two per cent dividends a month. This evidence was inadmissible, for it was not competent to show representations made to induce sales of stock without showing that Massie authorized the representations to be made.

One of the leases which the company was operating was called the Newgin lease, and checks of the Prairie Pipe Line Company, to which the oil from this lease was sold, were introduced in evidence to show that payment for the oil was

made to other persons than to the Ilgahoma Oil Company. This evidence was not competent. It was a transaction between other parties. Some of these checks were made payable to John M. Shipley, who was a director of the Ilgahoma Oil Company and had been an owner of the lease. The defendant offered to testify that he had seen an unrecorded assignment of the lease by Shipley to the Ilgahoma Oil Company but was not permitted to do so. It was shown that all the records of the corporation and the papers and books had disappeared and could not be found. It was error to refuse to permit the plaintiff in error to testify to the assignment of the lease, and it was also error to refuse to permit him to testify that in a book of the company marked "Lease Sales, Profit and Loss," there was a record of a transaction which resulted in a profit of $27,000 to the company. The People claimed that the dividends paid by the company were not paid out of the profits but out of the capital of the company, and it was proper for the defendant to show his information, derived from the books of the company, that the company had made profits out of which to pay the dividends.

It was erroneous to give the instruction in regard to the evidence of other offenses. Many of the other transactions referred to in the instructions were sales of stock made by Noble after the sale to the prosecuting witness, and Noble's statements and conduct in connection with these sales were detailed to the jury though there was no evidence that the plaintiff in error had any knowledge of the means which Noble was using or the representations which he was making. The evidence was clearly insufficient to show any intention on the part of plaintiff in error to swindle. It rather tends to show that he was convinced of the value of the oil property and of the success of the venture in which he was himself the heaviest loser. Even if he failed to exercise good judgment in investing in the stock, or in his action as director and president of the cor-

poration, he could not properly be found guilty on this indictment unless the evidence shows an intention to swindle, and this it fails to do.

The judgment will be reversed.    *Judgment reversed.*